**HATCH, JAMES & DODGE, P.C.**
Mark F. James (5295)
10 W. Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone:  (801) 363-6363
Facsimile:  (801) 363-6666
**Email:  mjames@hjdlaw.com**

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (*Pro Hac Vice Application forthcoming*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.  (*Pro Hac Vice Application forthcoming*)
240 Townsend Square
Oyster Bay Cove, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email:  tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

---

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROB HANSEN, Derivatively and on Behalf of LIFEVANTAGE CORPORATION, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiff, | **JURY DEMAND** |
| v. | **Case No. 2:17-cv-00075-DN** |
| DARREN JAY JENSEN, MARK R. JAGGI, MICHAEL A. BEINDORFF, DAVID S. MANOVICH, GARRY MAURO, GEORGE E. METZGER, RICHARD OKUMOTO, and | **Judge David Nuffer** |

1

DAVE TOOLE,

        Defendants,

        and

LIFEVANTAGE CORPORATION,

        Nominal Defendant.

Plaintiff Rob Hansen ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant LifeVantage, Inc. ("LifeVantage" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Darren Jay Jenson, Mark R. Jaggi, Michael A. Beindorff, David S. Manovich, Garry Mauro, George E. Metzger, Richard Okumoto, and Dave Toole (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of LifeVantage, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement.  As and for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LifeVantage, news reports, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of LifeVantage's directors and officers.

2.      LifeVantage makes dietary supplements and skincare products and sells them through independent distributors and online.

3.      On September 13, 2016, LifeVantage filed a Form 12b-25 with the SEC stating it would not be able to file its Annual Report by the filing deadline because the Company is undergoing an internal review of policies and procedures rendering financial information affected by the review indeterminable. LifeVantage stated in relevant part:

> LifeVantage Corporation (the "Company") is unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "Form 10-K") prior to the filing deadline. Following an internal review by Company personnel of its policies and procedures, the Company is in the process of reviewing its sales into certain international markets and the revenue and income tax accruals associated with such sales. The Company is currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.
>
> The review relates to sales of the Company's products in certain international markets and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets. Consequently, the Company will experience a delay in the timely filing of the Form 10-K. The Company will not be in a position to release financial results for the fiscal year ended June 30, 2016 until the independent review by the Audit Committee is completed. The Company is working diligently on this matter, however, there can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period of 15 calendar days provided under Rule 12b-25 of the Exchange Act.

4.      In response to the announcement, LifeVantage stock fell by $1.32 per share, or 12.69%, closing at $9.08 per share on September 14, 2016.

5.      Between November 4, 2015 and September 13, 2016 (the "Relevant Period"), the trading public was under a false impression of the Company's developmental and regulatory advances. During the Relevant Period, the Individual Defendants intentionally and/or recklessly caused the Company to make materially false and misleading statements regarding the Company's business and operations and its compliance policies. Specifically, the Individual Defendants caused the Company to fail to disclose the following: (a) the Company lacked effective internal controls; (b) the Company violated various countries' laws and regulations governing the Company's sales in those countries; and (c) due to the foregoing, the Company's statements made to the investing public during the Relevant Period were materially false and misleading.

6.      The Company's public statements were materially false and misleading at all relevant times, and caused an artificial inflation of LifeVantage's stock price.

7.      The Individual Defendants breached their fiduciary duties by permitting, facilitating, and causing the Company to make false and misleading statements and/or omissions of material fact and by permitting, facilitating, and causing the Company to fail to correct these false and misleading statements and/or omissions of material fact.

8.      The Individual Defendants also breached their fiduciary duties by knowingly or recklessly failing to maintain effective internal controls and causing and/or permitting the

Company to violate various countries' laws and regulations governing the Company's sales in those countries.

9.      The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's CEO-President-Director, and its CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Utah (the "Securities Fraud Class Action"), the need to undertake the Company's Audit Committee's internal review, the need to remediate the Company's internal controls, losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

10.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current Directors, of the collective engagement in fraud, of the substantial likelihood of the Directors' liability in this derivative action and of certain of them in the Securities Fraud Class Action, and of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the underlying claims of the Securities Fraud Class Action.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Utah or who has minimum contacts with this District to justify the exercise of jurisdiction over them.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff is a current shareholder of LifeVantage common stock. Plaintiff has continuously held LifeVantage common stock since before the beginning of the Relevant Period.

**Nominal Defendant LifeVantage**

16.     Nominal Defendant LifeVantage is a Colorado corporation with its principal executive offices at 9785 South Monroe Street, Suite 300, Sandy, Utah 84070.

17.     LifeVantage is registered to do business in Utah.  LifeVantage's Utah Entity Number, 72-85991-0143, is listed on the website for the Utah Division of Corporations and Commercial Code.

18.     LifeVantage stock trades on the NASDAQ under the ticker symbol "LFVN."

**Defendant Jensen**

19.     Darren Jay Jensen ("Jensen"), at all relevant times, has been the Company's President, Chief Executive Officer, and a Director.  According to the Company's Schedule 14A filed with the SEC on September 11, 2015 (the "2015 Proxy Statement"), Defendant Jensen beneficially owned around 143 thousand shares of the Company's common stock as of August 31, 2015, which was about 1% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on November 4, 2015, the beginning of the Relevant Period, was $7.78, Jensen owned about $1.11 million worth of LifeVantage stock.[1]

20.     For the fiscal year ended June 30, 2016, Defendant Jensen received $2,602,828. This included $550,000 in cash and $2,031,840 in stock awards.  June 30, 2015, Defendant Jensen received $1,152,164 in compensation from the Company.  This included over $667,000 in

---

[1] All references made herein to the number of Company shares owned by Individual Defendants before October 19, 2015 divide by seven the actual number of shares they owned in order to take into account a 7-1 reverse stock split consummated on October 19, 2015, as stated in the Company's Form 10-Q Quarterly Report that was filed with the SEC on November 4, 2016.  In the same vein, all references made herein to the price per share of Company stock before October 19, 2015 multiply the actual price by seven.

Case 2:17-cv-00075-DN   Document 2   Filed 01/30/17   Page 8 of 48

cash, a cash bonus of $451,000 and $630,000 worth of stock.  Jensen's base salary for 2015 was
$550,000.

21.     The Company's Form 10-K filed with the SEC on December 12, 2016 ("2016 10-
K") stated the following about Defendant Jensen:

*MR. DARREN JENSEN*. Mr. Jensen was appointed as our President and Chief Executive
Officer in May 2015. He was appointed to our board of directors in January 2016 by the
board of directors and has not previously been up for election at an annual meeting of
shareholders. From June 2014 to May 2015, Mr. Jensen served as the President-Americas
and from September 2012 to June 2014 as the Chief Sales Officer at Jeunesse Global, a
privately held direct selling anti-aging and skin care company. Prior to joining Jeunesse
Global, Mr. Jensen served from August 2011 to June 2012 as the Chief Sales Officer of
Ampegy, a privately held direct selling company in the energy industry. Prior to that, he
was the Executive Vice President and Corporate General Manager at Agel Enterprises, a
nutritional supplements direct selling company, where he was also a Co-Founder of the
Agel Cares Foundation. From 2003 to 2005, Mr. Jensen was the Director of International
Business Development at USANA Inc. Mr Jensen served as a Brand Manager at Amway
Global from 1995 to 1997. Mr. Jensen began his direct selling career at Nu Skin
Enterprises in Provo, where he served as an International Marketing Specialist from
1990-1995. Mr. Jensen received a bachelor of arts degree from Brigham Young
University. Mr. Jensen's more than 25 years of experience in the direct selling industry
brings to our board of directors deep industry expertise as well as strong leadership in all
aspects of our business.

**Defendant Jaggi**

22.     Defendant Mark R. Jaggi ("Jaggi") at all relevant times, has been Company Chief
Financial Officer and Treasurer—until he was terminated by the Company on January 18, 2017.
According to the Company's Form 8-K filed with the SEC on August 24, 2015, Defendant Jaggi
was granted around 17,143 shares of the Company's common stock. Given the price per share of
the Company's common stock at the beginning of the Relevant Period, $7.78, Jaggi owned over
$133,000 worth of LifeVantage stock.

- 8 -

23.     For the fiscal year ended June 30, 2016, Defendant Jaggi received $990,649. This included $294,688 in cash and $695,961 in stock awards.

24.     The 2015 Proxy Statement stated the following about Defendant Jaggi:

*MR. MARK JAGGI.* Mr. Jaggi was appointed our Chief Financial Officer and Treasurer in August 2015. From March 2012 to August 2015, Mr. Jaggi was the Executive Vice President, Treasurer and Chief Financial Officer of Twinlab Consolidated Holdings Inc., a publicly traded nutritional supplements and natural products company. Prior to joining Twinlab Consolidated Holdings Mr. Jaggi was with Summit Industries, a manufacturer and marketer of pharmaceutical and non-regulated liquid and cream solutions, as its President and Chief Executive Officer from 2009 until March 2012 and as its Chief Financial Officer from 2007 to 2009. Prior to Summit Industries, Mr. Jaggi served as Director of Finance at O'Sullivan Industries from 2005 to 2007 and held positions of increasing responsibility at Ford Motor Company from 1998 to 2005. Mr. Jaggi holds a bachelor's degree in Finance from the University of Utah and an MBA from Duke University.

**Defendant Beindorff**

25.     Defendant Michael A. Beindorff ("Beindorff") has been a Company Director since January 2012.  He is the Chair of the Strategic Planning Committee and member of the Audit Committee and Nominating and Corporate Governance Committee.  According to the Company's 2015 Proxy Statement, as of August 31, 2015, Defendant Beindorff beneficially owned around 44,443 shares of the Company's common stock.  Given the price per share of the Company's common stock at the beginning of the Relevant Period, $7.78, Beindorff owned over $345,000 of Company stock.

26.     For the fiscal year ended June 30, 2016, Defendant Beindorff received a base salary of $60,000 and total compensation of $135,000 from the Company.  For the fiscal year

ended June 30, 2015, Defendant Beindorff received a base salary of $60,000 and total compensation of $92,750 from the Company.

27.     The 2015 Proxy Statement stated the following about Defendant Beindorff:

*MR. MICHAEL A. BEINDORFF.* Mr. Beindorff has been an independent member of our board of directors since January 2012. Mr. Beindorff brings more than thirty years of experience in general management, operations, sales and marketing with a strong track record of building and leading disciplined organizational teams, driving rapid, profitable growth and delivering results across a variety of business environments. He currently serves as Principal and President of the Far Niente Group, a management consultancy focused on helping clients build effective business models, strong differentiated brands, viable product lines and sustainable businesses while maximizing return on investment, a position he has held since 2008. From 2004 to 2008 he served as Chief Operating Officer of Exclusive Resorts, a private club for luxury travel experiences, where he helped build a strong leadership team and a profitable, sustainable business. From 2002 to 2004 he served as Principal & President of the Greentree Group, a management consultancy focused on helping clients build strong brands and effective business models. From 1999 to 2002 he served first as President & COO and then as Chairman & Chief Executive Officer of PlanetRx.com, an internet pharmacy and on-line health portal. From 1995 to 1999 he served as Executive Vice President of Marketing, Operations & Product Management for VISA. From 1978 to 1995 he held various positions leading global advertising, marketing and brand management for The Coca-Cola Company and Rhodes Furniture. Mr. Beindorff received his Bachelor of Science in Business Administration from the University of Alabama and his Masters of Business Administration from the Gouzuietta Business School at Emory University. Mr. Beindorff's broad background building and leading organizations, and experience in building strong sales and marketing, and branding initiatives brings to our board of directors expertise in operations and oversight as well as strong leadership and initiative.

**Defendant Manovich**

28.     Defendant David S. Manovich ("Manovich") has been a company director since January 2012. He is the Chair of the Corporate Governance Committee and member of the Compensation Committee. Strategic Planning Committee and member of the Audit Committee and Nominating and Corporate Governance Committee.  According to the 2015 Proxy Statement, as of August 31, 2015, Defendant Manovich beneficially owned around 106,505

shares of the Company's common stock.  Given the price per share of the Company's common

stock at the beginning of the Relevant Period of $7.78, Manovich owned over $828,000 worth of

LifeVantage stock.

29.    For the fiscal year ended June 30, 2016, Defendant Manovich received a base

salary of $60,000 and total compensation of $135,000 from the Company.  For the fiscal year

ended June 30, 2015, Defendant Manovich received over $293,944 thousand in compensation

from the Company.  This included $185,000 in cash, $95,750 in stock, and $13,194 in temporary

living and commuting expenses paid by the company.

30.    The 2015 Proxy Statement stated the following about Defendant Manovich:

*MR. DAVID S. MANOVICH.* Mr. Manovich has been a member of our board of directors
since January 2012. In addition, from February 2015 through May 2015, Mr. Manovich
served as our Executive Vice Chairman on an interim basis. Except for the period of his
interim service as Executive Vice Chairman, Mr. Manovich has been and currently is an
independent member of our board of directors. Following his interim service, our board
of directors determined Mr. Manovich resumed being an independent member of our
board of directors. Mr. Manovich has extensive experience in finance management and
oversight, executive sales and marketing operations as well as distribution management
and development. He currently serves as Managing Partner of D&S Investments, a
private investment entity focused on portfolio management for long term capital
appreciation, a position he has held since 2006. From 2001 to 2006 Mr. Manovich was
retired. From 1999 to 2001, he served as Chief Operating Officer and Senior Vice
President of @Road Inc., a start-up wireless data services company. From 1998 to 1999,
he served as a Partner of Union Atlantic, LC, an investment and venture capital merchant
banking company. From 1997 to 1998, he served as Executive Vice President at Apple
Computer where he was responsible for worldwide sales and support. From 1996 to
1997, he served as Vice President of Sales for Fujitsu P.C. where he was responsible for
sales and channel development for the U.S., Canada, Central and Southern America and
Caribbean markets. From 1985 to 1996, he served in various positions at Apple
Computer, including as Vice President of U.S. consumer division, Director of Business
Markets and Country Manager for the UK/Ireland as well as Regional & District Sales
Manager in the U.S. From 1983 to 1985, he served as District Manager and franchise
owner of Entre Computer. He served as Controller of the Federal Home Loan Bank of
Seattle in 1983. Mr. Manovich began his career at Deloitte, Haskins & Sells, where he

served as a Certified Public Accountant from 1979 to 1983. Mr. Manovich received his Bachelor of Science in Business Administration with an emphasis on Marketing and Management from the University of Montana and his Masters of Business Administration with an emphasis on Finance from the University of Montana. Mr. Manovich's financial and accounting capabilities as well as his sales and marketing experience brings to our board of directors experience in executive oversight, expertise in financial modeling and insight, as well as leadership in operations.

**Defendant Mauro**

31.     Defendant Garry Mauro ("Mauro") has been a Company Independent Director since April 2008 and Chair of the Company's Board of Directors since November 2013.  He is a member of the Company's Audit Committee and Compensation Committee. According to the 2015 Proxy Statement, on August 31, 2015, Defendant Mauro beneficially owned 124,993 shares of the Company's common stock.  Given the price per share of the Company's common stock at the beginning of the Relevant Period of $7.78, Mauro owned around $972,000 worth of LifeVantage stock.

32.     For the fiscal year ended June 30, 2016, Defendant Mauro received a base salary of $69,500 and total compensation of $144,500 from the Company.  For the fiscal year ended June 30, 2015, Defendant Mauro received $98,750 in compensation from the Company.  This included $66,000 in cash, and $32,750 in stock.

33.     The 2015 Proxy Statement stated the following about Defendant Mauro:

*MR. GARRY MAURO*. Mr. Mauro has been an independent member of our board of directors since April 2008 and has served as the chairman of the board of directors since November 2013. Mr. Mauro has worked for over 30 years at the local, state and national levels on behalf of both private and public sector entities. From 1983 to 1999, he served as Commissioner of the Texas General Land Office overseeing the management of more than 20 million acres of state land, 18,000 oil and gas wells, and the state's benefit program for Veterans. During his tenure as Commissioner, he also chaired the Veterans Land board of directors, the School Land board of directors, the Parks and Wildlife board

- 12 -

of directors for Lease, the Texas Department of Corrections board of directors for Lease, the University board of directors for Lease, the Coastal Coordination Council and the Texas Alternative Fuels Council and co-chaired the Sustainable Energy Development Council. He has received numerous honors and awards for his civic and philanthropic contributions in environmental, political and business arenas, including the "Man of the Year Award" from the Texas League of Women Voters and the "Rising Star of Texas Award" from Texas Business Magazine. In 1998, he was the Texas Democratic Party nominee for Governor. Mr. Mauro's broad range of expertise brings to our board of directors experience in management and operations as well as strong leadership and oversight.

**Defendant Metzger**

34.     Defendant George E. Metzger ("Metzger") has been a Company Director since January 2012. He is the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee and Strategic Planning Committee. According to the Company's 2015 Proxy Statement, as of August 31, 2015, Defendant Metzger beneficially owned about 21,429 shares of the Company's common stock. Given the price per share of the Company's common stock at the beginning of the Relevant Period, Metzger owned around $165,000 worth of Company stock.

35.     For the fiscal year ended June 30, 2016, Defendant Metzger received a base salary of $63,500 and total compensation of $138,500 from the Company. For the fiscal year ended June 30, 2015, Defendant Metzger received total compensation of $92,750 from the Company. This included $60,000 in cash and $32,750 in stock.

36.     The 2015 Proxy Statement stated the following about Defendant Metzger:

*GEORGE E. METZGER* . Mr. Metzger has been an independent member of our board of directors since January 2012. Mr. Metzger has more than thirty years of experience in executive compensation, human resources, benefits and labor relations as well as workforce planning. In December 2007, Mr. Metzger retired from Textron Inc., a company with international operations in multiple industries. Mr. Metzger worked in

various capacities while at Textron beginning in 1985, and most recently served as Vice President of Human Resources and Benefits from 2000 until December 2007. In this role he was responsible for Textron's networked integrated human resource delivery system, including account based healthcare plans, retirement plan redesign and reward structure. From 1976 to 1985, he worked for Rockwell International, most recently as Director Human Resources. He worked at Clark Equipment Company from 1969 to 1976, where he served as Director Labor Relations at the time of his departure. From June 2008 until March 2014, Mr. Metzger served on the board of directors of WorkWell Systems, Inc., a privately held physical medicine and workers' compensation solutions company. Mr. Metzger received his Bachelor of Science in Business Administration from Trine University. Mr. Metzger's extensive experience with executive compensation, labor relations and benefits brings to our board of directors experience in human resources oversight and workforce planning and development.

**Defendant Okumoto**

37.     Defendant Richard Okumoto ("Okumoto") has been a Company Director since November 2012.  Defendant Okumoto is the Chair of the Audit Committee and a member of the Strategic Planning Committee. According to the Company's 2015 Proxy Statement, as of August 31, 2015, Defendant Okumoto beneficially owned 25,000 shares of the Company's common stock.  Given the price per share of the Company's common stock at the beginning of the Relevant Period of $7.78, Okumoto owned $194,500 worth of Company stock.

38.     For the fiscal year ended June 30, 2015, Defendant Okumoto received a base salary of $63,500 and total compensation of $138,500 from the Company.  For the fiscal year ended June 30, 2015, Defendant Okumoto received $92,750 in total compensation of from the Company. This included $60,000 in cash and $32,750 in stock.

39.     The 2015 Proxy Statement stated the following about Defendant Okumoto:

*MR. RICHARD OKUMOTO*. Mr. Okumoto has been an independent member of our board of directors since November 2012. Mr. Okumoto has over thirty years of corporate finance, operations, and strategy development experience in rapid growth technology companies in Silicon Valley. Mr. Okumoto is currently an adjunct professor in the Lucas

- 14 -

Graduate School of Business MBA program at San Jose State University; a position he has held since 2008. He has been a principal with the consulting firm of Miller-Okumoto, Inc. since 2007. From 2008 to 2010 Mr. Okumoto was the audit committee chairman and a member of the compensation committee for Logic Vision, Inc., a publicly traded electronic design automation company. From 2007 to 2009 Mr. Okumoto was the chief financial officer of Advanced Micro-Fabrication Equipment, Inc., a global micro-fabrication equipment company. From 2003 to 2006 Mr. Okumoto was the chief financial officer of Photon Dynamics, Inc., a publicly held manufacturer of flat panel display test equipment. From 1998 to 2001 Mr. Okumoto was the chief executive officer of TMT, Inc., a manufacturer of test equipment for the global semiconductor industry, and the Vice-President and General Manager for the Analog, Linear, and RF test equipment division of the acquiring company, Credence Systems Corporation, a manufacturer of test equipment for the global semiconductor industry. From 1993 to 1998 Mr. Okumoto was the executive vice president and chief financial officer of Credence Systems Corporation. From 1990 to 1993 Mr. Okumoto was the Corporate Controller at Novellus Systems, Inc., a supplier of wafer fabrication equipment and services. From 1974 to 1990 Mr. Okumoto held finance and operations roles at such companies as: Fairchild Semiconductor Corporation, Measurex Corporation (Honeywell), Commodore Business Machines, Inc., Basys, Inc., and Digital Research Corporation. Mr. Okumoto also serves on the board of directors of Vantage Technology Corporation, a privately held micro-analytical metrology tool company. Mr. Okumoto received his Bachelor of Science in Business Administration with an emphasis in Accounting from San Jose State University and his Master of Arts in Communication and Leadership from Gonzaga University. Mr. Okumoto holds a Registered Financial Consultant designation: RFC ® . Mr. Okumoto brings to our board of directors extensive business background in finance and accounting, general management, and business strategy as a public company chief financial officer and audit committee chairman, as a chief executive officer and division general manager, and practitioner and academic of business strategy.

**Defendant Toole**

40.     Defendant Dave Toole ("Toole") has been a Company Director since January 2016. According to the Company's Form 8-K filed January 4, 2016, Defendant Toole received monthly compensation of $5,000 per month and will receive an equity award of $150,000 worth of Company stock on the one-year anniversary of the date he joined the Company's Board of Directors.

41.   The 2016 10-K stated the following about Defendant Toole:

*MR. DAVID TOOLE.* Mr. Toole has been an independent member of our board of directors since January 2016 and was appointed by the Board of Directors and has not previously been up for election at an annual meeting of shareholders. Mr. Toole brings over 35 years of experience as a technology, supply chain, digital media and video expert, and has been the Chief Executive Officer of MediaMobz, a private company that enables brands to increase their capacity to create video centric digital media that drives business results, since 2008. Mr. Toole is also currently the Chief Executive Officer of Outhink Media, an emerging media incubator, a position he has held since 2001. Prior to Outhink Media, Mr. Toole spent 21 years at GaSonics International, a semiconductor capital equipment company, where he worked in various positions, including as Chief Executive Officer from 1993 to 2001. As Chief Executive Officer at GaSonics, Mr. Toole led the company's initial public offering in 1994 and the sale of the company to Novellus Systems in 2001. Mr. Toole began his career at Advance Micro Devices, a manufacturer of early computer chips, where he was a production supervisor from 1976 to 1979. Mr. Toole received his Bachelor of Arts degree in Business from the University of California, Santa Barbara. Mr. Toole's executive leadership experience, including as the Chief Executive Officer of a public company, and extensive digital media experience brings to our board of directors strong leadership and oversight as well as strategic leadership as our company leverages digital media to enhance our business initiatives.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

42.   By reason of their positions as officers, directors and/or fiduciaries of LifeVantage and because of their ability to control the business and corporate affairs of LifeVantage, the Individual Defendants owed LifeVantage and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LifeVantage in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LifeVantage and its shareholders so as to benefit all shareholders equally.

43.     Each director and officer of the Company owes to LifeVantage and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of LifeVantage, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of LifeVantage were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LifeVantage, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised LifeVantage's Board at all relevant times.

47.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty not to effect and to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the omission of the fact that LifeVantage  was not on track to file an annual 10-K report for the fiscal period ending June 30, 2016.

48.     To discharge their duties, the officers and directors of LifeVantage were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of LifeVantage were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Colorado, Utah, and the United States;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how LifeVantage conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of LifeVantage and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that LifeVantage's operations would comply with all laws and LifeVantage's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

49.      Each of the Individual Defendants further owed to LifeVantage and the shareholders the duty of loyalty requiring that each favor LifeVantage's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of LifeVantage and were at all times acting within the course and scope of such agency.

51.     Because of their advisory, executive, managerial, and directorial positions with LifeVantage, each of the Individual Defendants had access to adverse, non-public information about the Company.

52.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LifeVantage.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

53.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

54.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, future

business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of LifeVantage was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

57.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LifeVantage, and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### November 4, 2015 Press Release and Quarterly Report

58.     At the close of the trading day on November 4, 2015, shares of LifeVantage were trading on the NASDAQ for $7.78 per share.

59.     That day, after the market closed, the Company filed a Form 8-K with the SEC that attached a press release providing fiscal results for the first quarter of fiscal year 2016 ending September 30, 2015, and announcing a planned expansion in European markets. Specifically, the Company disclosed: "Our first quarter results were in-line with our expectations and reflect stability in our revenue and operating results." LifeVantage reported revenues of $45.4 million and net income of $1.1 million, $0.08 per diluted share.

60.     The press release recounted statements from Defendant Jensen that "In the quarter, we made progress on our growth plan that focuses on critical aspects of our business, including the launch of new technologies, brand differentiation, the introduction of new products, and international growth. Based on our year-to-date results and outlook for the remainder of the year, we are reiterating our annual guidance and continue to expect to achieve revenue, operating margin, and net income improvements in fiscal 2016."

61.     The press release also included statements from Defendant Jensen on the European expansion. Defendant Jensen said "At our annual convention held last month, we were encouraged by the record attendance and high level of distributor energy and engagement. We made a number of exciting announcements that improve the foundation of our business and our growth trajectory. We announced our European Union expansion plan with entry in the United

Kingdom and Netherlands in February 2016. The EU is a large and growing region for direct selling, and we look forward to introducing European customers to LifeVantage products and capturing our share of the market. In addition, we enhanced our TrueScience™ Skin Care system with the launch."

62. On that same day, after the stock market closed, LifeVantage held a conference call with investors in which Defendant Jensen, accompanied by Defendant Jaggi, spoke on behalf of the company, *inter alia*, its earnings for the quarter ended September 30, 2015 ("Q1-2016") . On the call, Defendant Jensen began by summarizing the Q1-2016 fiscal results and LifeVantage's entry into European markets. Jensen also discussed acceleration of new product innovation and present availability to distributors and preferred customers. Jensen stated near-term pressure on  open operating margins due to investment in growth programs. In his final comments, Jensen commented on the Company's 7 to 1 reverse stock split enabling the Company to meet the NASDAQ minimum bid price requirement. On the call, Defendant Jaggi stated the Company expected revenues for fiscal year 2016 to be between $195 million to $210 million and operating margins between 8.5% and 10.5%. In response to questions about LifeVantage's business in Japan, Defendant Jensen responded that the Company's performance in Japan relied on greater leadership and business in Japan would bottom out in the second quarter.

63. In response to questions about LifeVantage's future performance with active distributers and preferred customers, Jensen represented "[e]verything is based on excitement within the field and as there is additional excitement within our independent contractors that

- 23 -

translates into behavior and if you look at our most recent event generally I think a good barometer of that is our major event."

64.     On November 4, 2015, LifeVantage also filed a quarterly report on Form 10-Q with the SEC, reporting the Company's results for the quarter ending September 30, 2015 (the "1Q 2016 10-Q").

65.     Attached to the 1Q 2016 10-Q were certifications pursuant to Rule 13a-15(e), 15-d-15(e), 13(a)-15(f), and 15(d-15(f) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Jensen and Jaggi attesting to the accuracy of the 1Q 2016 10-Q.

### February 9, 2016 Press Release and Quarterly Report

66.     On February 9, 2016, the Company filed a Form 8-K with the SEC that attached a press release (the "February 9th Press Release") reporting financial results for the second quarter of fiscal year 2016 ended December 31, 2015. The Company reported $52 million in revenue, a 14.6% increase compared to the prior quarter, which ended September 30, 2015. The February 9th Press Release also reported net income of $1.6 million, $0.11 per diluted share.

67.     Also in the February 9th Press Release, Defendant Jensen discussed the growth and positive performance of the Company. Jensen said, "We are pleased to report revenue growth on both a sequential and year-over-year basis, which underscores the early success of our growth plan and gives us confidence that our business is on a path to deliver long-term and sustainable improved financial performance." Jensen also commented on the development and positive reception of a new product, PhyIQ. Jensen said, "In the second quarter, we made meaningful progress on our critical growth initiatives to expand our product portfolio with the

launch of PhysIQ™ Smart Weight Management System, marking our entry into the estimated $148 billion worldwide weight management market. While it is still in its very early stages, we have been encouraged by the strong consumer and distributor responses to our newest product offerings."

68.    Also on February 9, 2016, the Company held a conference call to discuss the results for the quarter ended December 31, 2015.  On the conference call, the Company touted 14.6% increase in revenues over the prior quarter and growth of 7.3% in the Japanese market.

69.    On the same day, the Company also filed a quarterly report for the quarter ended December 31, 2015 on a Form 10-Q with the SEC ("2Q 2016 10-Q"), which was signed by Defendants Jensen and Jaggi.  The Company reported the fiscal results stated in the February 9th Press Release.

70.    The 2Q 2016 10-Q also stated about its internal controls being effective, as follows:

> We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) that are designed to ensure that the information required to be disclosed in the reports we file or submit under the Exchange Act is (a) recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and (b) accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure. As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of our management, including our CEO and CFO, of the effectiveness and design and operation of such disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of December 31, 2015.

71.     Attached to the 2Q 2016 10-Q were certifications pursuant to Rule 13a-15(e), 15-d-15(e), 13(a)-15(f), and 15(d-15(f) under the Exchange Act and the SOX signed by Defendants Jensen and Jaggi attesting to the accuracy of the 2Q 2016 10-Q.

**May 4, 2016 Press Release and Quarterly Report**

72.     On May 4, 2016, LifeVantage filed with the SEC a Form 8-K that attached a Press Release reporting financial results for the third quarter of fiscal year 2016 ended March 31, 2016. The press release (the "May 4th Press Release") highlighted a 24.4% increase in revenue to $56.2 million, an increase of 24.4% from the same quarter the year prior. The May 4th Press Release also reported net income of $1.0 million, $0.07 per diluted share.

73.     Also in the May 4th Press Release, Defendant Jensen stated, "We are excited about our record revenue performance during the third quarter. We are seeing positive trends in our existing business, leading up to what may be the biggest new product launch in the company's history with the upcoming May 17th cyber launch of NRF1," and "We are successfully combining visionary product innovation with a highly duplicatable business opportunity, further enabling our independent distributors to be successful. The results are evident in our sales growth."

74.     Also on May 4, 2016, the Company filed a quarterly report for the quarter ended March 31, 2016 on a Form 10-Q with the SEC ("3Q 2016 10-Q"), which was signed by Defendants Jensen and Jaggi.  The 3Q 2016 10-Q reported the financial results stated in the May 4th Press Release.

75.    The 3Q 2016 10-Q also stated about its internal controls being effective, as follows:

> We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) that are designed to ensure that the information required to be disclosed in the reports we file or submit under the Exchange Act is (a) recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and (b) accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure. As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of our management, including our CEO and CFO, of the effectiveness and design and operation of such disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2016.

76.    Attached to the 3Q 2016 10-Q were certifications pursuant to Rule 13a-15(e), 15-d-15(e), 13(a)-15(f), and 15(d-15(f) under the Exchange Act and the SOX signed by Defendants Jensen and Jaggi attesting to the accuracy of the 3Q 2016 10-Q.

77.    Two days later, on May 6, LifeVantage held a conference call corroborating the statements about the Company's business and operations that were reported in the May 4th Press Release and 3Q 2016 10-Q.

**THE TRUTH EMERGES**

78.    On September 13, 2016, after market-close LifeVantage filed with the SEC a Form 8-K that attached a press release announcing it would not be able to file its Form 10-K with the SEC by the filing deadline. The press release ("September 13th Press Release") stated in relevant part:

> Following an internal review by Company personnel of its policies and procedures, the Company is in the process of reviewing its sales into certain international markets and the

revenue and income tax accruals associated with such sales. The Company is currently unable to estimate the impact of the review to net revenue, tax expense, net income or other aspects of its financial statements for the fiscal year ended June 30, 2016 or any potential prior periods. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.

The review relates to sales of the Company's products in certain international markets and the determination of revenue and the deductibility of commission and incentive expenses associated with such sales, as well as the policies and procedures related to sales in those specific markets. The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K.   There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.

LifeVantage President and Chief Executive Officer Darren Jensen stated, "We regularly review our policies and procedures to ensure the utmost accuracy and transparency in our financial reporting. Our Board's Audit Committee has engaged independent external resources to review our policies and procedures and support our team in finalizing our financial results for fiscal 2016."

The Company will not be in a position to release financial results for the fiscal year ended June 30, 2016 until the independent review by the Audit Committee is completed. The Company is working diligently on this matter and will, as soon as practicable, make a further announcement regarding the updated timing of the release of financial results and a conference call on its financial results.

79.     In response to this news, LifeVantage stock price fell 12.7%, from $10.40 to $9.08 per share.

80.     On September 29, 2016, the Company received a notice from NASDAQ that because the Company had not yet filed its Form 10-K for fiscal year 2016 with the SEC, the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1).

81.     On November 10, 2016, the Company filed a Form 12b-25, the Company announced that it would not file its Form 10-Q for the quarter ended September 30, 2016 with

- 28 -

the SEC on time for the same reasons that the Company previously announced it would not filed

the Form 10-K for fiscal year 2016 on time.

82.     On December 12, 2016 the Company filed the 2016 10-K, which finally admitted

that the Company's internal controls were ineffective as of June 30, 2016.  The 2016 10-K stated

in relevant part:

> Our management, with the participation of our Chief Executive Officer and our Chief
> Financial Officer, has evaluated the effectiveness of our disclosure controls and
> procedures (as such term is defined in Rule 13a-15(e) under the Exchange Act) as of June
> 30, 2016. Based on that evaluation, our management identified certain design deficiencies
> in our internal control over financial reporting related to the lack of sufficient controls
> governing our international business policies, practices, monitoring and training as
> described below. Based on the evaluation of our disclosure controls and procedures as of
> June 30, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as
> a result of a material weakness in our internal control over financial reporting, our
> disclosure controls and procedures were not effective as of June 30, 2016.

83.     The 2016 10-K also disclosed the results of the Company's Audit Committee's

internal review, as follows:

> On September 13, 2016, we announced the delayed filing of this Annual Report on Form
> 10-K to allow the Audit Committee of our Board of Directors to conduct an independent
> review related to the distribution of our products into countries outside the U.S, in which
> those products are not registered or that otherwise impose stringent restrictions on our
> direct selling model, and the associated revenue and tax and other accruals associated
> with such sales. This independent review was initiated following internal reviews by
> Company personnel and was further informed by the content of employee complaints.
> The Audit Committee retained independent counsel to assist it in conducting the review.
> Based on its independent review, the Audit Committee determined that (i) we had sold
> our products to independent distributors who carried or shipped such products primarily
> into four countries outside the U.S. in which those products are not registered or that
> otherwise impose stringent restrictions on our direct selling model; (ii) we allowed
> individuals who were resident in countries that impose stringent restrictions on our direct
> selling model to enroll as independent distributors; and (iii) we did not have in place
> sufficient controls governing our international business policies, practices, monitoring
> and training to provide reasonable assurance that such distribution of our products
> complied with applicable customs, tax and other regulatory requirements. The inadequate

controls and processes related to the lack of documented country-specific policies and procedures governing (i) distributor enrollment policies and procedures; (ii) approved distributor payment and collection methods; (iii) methods for shipping and order fulfillment; (iv) approval requirements for transactions with distributors outside of our approved compensation plans; and (v) lack of change controls related to changes to existing country-specific policies and procedures. In addition, we had inadequate controls in place related to the training, monitoring and oversight of our personnel who were involved in or managed our international business operations. Accordingly, we identified a material weakness in our internal controls over financial reporting as of the period ended June 30, 2016.

84.     On December 12, 2016, the Company also finally filed its Form 10-Q for the first quarter of fiscal 2017 for the period ended September 30, 2016 ("1Q 2017 10-Q").  The 1Q 2017 10-Q admitted that the Company's internal controls were ineffective as of September 30, 2016. The 1Q 2017 10-Q stated in relevant part:

> As the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness and design and operation of such disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based on that evaluation, our management identified certain design deficiencies in our internal control over financial reporting related to the lack of sufficient controls surrounding our international business policies, practices, monitoring and training as described below. Based on the evaluation of our disclosure controls and procedures as of September 30, 2016, our Chief Executive Officer and Chief Financial Officer concluded that, as a result of a material weakness in our internal control over financial reporting, our disclosure controls and procedures were not effective as of September 30, 2016.

85.     In response to this news, LifeVantage stock price fell another 13.3%, from an opening price of $10.00 per share on December 12, 2016 to close at $8.67 per share on December 13, 2016.

86.     On December 14, 2016, the Company terminated Robert Urban, its Chief Operating Officer, as an employee of the Company.

87.    On January 18, 2017, the Company terminated its CFO, Defendant Jaggi.

88.    The statements referenced in ¶¶ 59-77 above were materially false and misleading because they misrepresented and failed to disclose the foregoing adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them.

89.    Specifically, the Individual Defendants caused the Company to fail to disclose during the Relevant Period the following: (a) the Company lacked effective internal controls; (b) the Company violated various countries' laws and regulations governing the Company's sales in those countries; and (c) due to the foregoing, the Company's statements made to the investing public during the Relevant Period were materially false and misleading.

90.    In summary, the Individual Defendants breached their fiduciary duties by permitting, facilitating, and causing the Company to make false and misleading statements and/or omissions of material fact and by permitting, facilitating, and causing the Company to fail to correct these false and misleading statements and/or omissions of material fact.

91.    Equally as significant, the Individual Defendants also breached their fiduciary duties by knowingly or recklessly failing to maintain effective internal controls and causing and/or permitting the Company to violate various countries' laws and regulations governing the Company's sales in those countries.

## DAMAGES TO LIFEVANTAGE

92.    As a direct and proximate result of the Individual Defendants' conduct, LifeVantage will lose and expend many millions of dollars.

- 31 -

93.     Such expenditures include, but are not limited to, legal fees associated with the Securities Fraud Class Action filed against the Company and Defendants Jensen and Jaggi, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

94.     Such expenditures include the cost of the Company's Audit Committee's internal review.  Indeed, the Company's 2016 10-K discloses: "This review has required us to expend significant management time and incur significant accounting, legal, and other expenses. Through the end of the first two quarters of fiscal 2017, we expect to incur between approximately $2.5 million to $3.0 million in additional selling, general and administrative expense related to the audit committee review and management's assessment of the related financial and internal control impact."

95.     Such expenditures also include the costs to remediate the Company's internal controls.  Indeed, the Company's 2016 10-K discloses: "through approximately the end of fiscal 2017, we expect to incur significant additional expenses associated with the remediation of internal controls over financial reporting and managing related operational issues."

96.     Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

97.     As a direct and proximate result of the Individual Defendants' conduct, LifeVantage has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

98.     Plaintiff brings this action derivatively and for the benefit of LifeVantage to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of LifeVantage and unjust enrichment, as well as the aiding and abetting thereof.

99.     LifeVantage is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100.     Plaintiff is, and has been since before the beginning of the Relevant Period, a LifeVantage shareholder.   Plaintiff will adequately and fairly represent the interests of LifeVantage in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

101.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

102.     A pre-suit demand on the Board of LifeVantage is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Jensen, Beindorff, Manovich, Mauro, Metzger, Okumoto, and Toole, (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

103.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they

engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

104.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.   As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

105.     Additional reasons that demand on Defendant Jensen is futile follow.   Defendant Jensen is the Company's Chief Executive Officer and President, and is thus, as the Company admits, a non-independent director.   Defendant Jensen was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, almost all of which he signed, and including many of which he personally made. His large Company stock holding, worth $1.11 million at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.   Moreover, Defendant Jensen is a defendant in the Securities Fraud Class Action.   Finally, Defendant Jensen conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting

and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Jensen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.    Additional reasons that demand on Defendant Beindorff is futile follow. His large Company stock holding, worth about $345,000 at the beginning of the Relevant Period reveals his interest in keeping the Company's stock price as high as possible. Moreover, Beindorff was a member of the Strategic Planning Committee and member of the Audit Committee and Nominating and Corporate Governance Committee. As a Director and a member of the Audit Committee, Defendant Beindorff conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Beindorff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107.    Additional reasons that demand on Defendant Manovich is futile follow. His large Company stock holding, worth about $828,000 at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. As a Director, Chair of the Corporate Governance Committee and member of the Compensation Committee, Defendant Manovich conducted little, if any, oversight of the Company's internal controls over

public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.   Thus, for these reasons, too, Defendant Manovich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108.   Additional reasons that demand on Defendant Mauro is futile follow.  Defendant Mauro's large Company stock holding, worth about $972,000 at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.   As a Director and a member of the Audit Committee and Compensation Committee, Defendant Mauro conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Mauro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.   Additional reasons that demand on Defendant Metzger is futile follow.  Defendant Metzger's large Company stock holding, worth around $165,000 at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. As a Director and Chair of the Compensation Committee and a member of the Nominating and

Corporate Governance Committee and Strategic Planning Committee, Defendant Metzger conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Metzger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Okumoto is futile follow. Defendant Okumoto's large Company stock holding, worth $194,500 at the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Defendant Okumoto, as Chair of the Audit Committee, a member of the Strategic Planning Committee, and a member of the Audit Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  Thus, for these reasons, too, Defendant Okumoto breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Toole is futile follow.  He is not independent because there are two agreements "between the Company and entities affiliated with

Mr. Toole, pursuant to which such entities are providing consulting advice to the Company," as per the Company's 2016 10-K. Defendant Toole's expected equity award of $150,000 worth of Company stock on the one-year anniversary of the date he joined the Company's Board of Directors reveals his interest in keeping the Company's stock price as high as possible.  As a Director Defendant Toole conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  Thus, for these reasons, too, Defendant Toole breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on the Board is futile follow.

113.    Additionally, the demand in this case is excused because the Directors, who are named as defendants in this action, are beholden to each other.  According to LifeVantage's Nominating and Corporate Governance Committee Charter, the Nominating and Corporate Governance Committee must "identify and evaluate individuals qualified to serve as members of our board of directors (including individuals nominated by shareholders in proposals made in writing to our Secretary that are timely received and that contain sufficient background information concerning the nominee to enable proper judgment to be made as to the nominee's qualifications and are otherwise in compliance with applicable laws) and establish a process for recruiting suitable candidates to our board of directors, including identifying the characteristics

and skills required by our board of directors and those existing on our board of directors." Thus, members of this committee make decisions that directly affect other directors' participation on the Board. Directors may fear retaliation by the Nominating/Corporate Governance Committee should Plaintiff's demand be accepted.

114.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.

115.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.   Thus, any demand on the Directors would be futile.

116.    LifeVantage has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for LifeVantage any part of the damages LifeVantage suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

117.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.   Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

118.    The acts complained of herein constitute violations of fiduciary duties owed by LifeVantage's officers and directors, and these acts are incapable of ratification.

119.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of LifeVantage.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors.  As a result, if the Directors were to sue themselves or certain of the officers of LifeVantage, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

120.    If there is no directors' and officers' liability insurance, then the Directors will not cause LifeVantage to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

121.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, cannot consider a demand with disinterestedness and independence.   Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

122.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

123.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LifeVantage's business and affairs.

124.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

125.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of LifeVantage.

126.    In breach of their fiduciary duties owed to LifeVantage, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact regarding the fiscal information of the Company.

127.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the

Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of LifeVantage's securities.

128.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of LifeVantage's securities.

129.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

130.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, LifeVantage has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

131.    Plaintiff on behalf of LifeVantage has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

132.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of LifeVantage.

134.    The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from LifeVantage that was tied to the performance or artificially inflated valuation of LifeVantage, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

135.    Plaintiff, as a shareholder and a representative of LifeVantage, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

136.    Plaintiff on behalf of LifeVantage has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LifeVantage, for which they are legally responsible.

139.    As a direct and proximate result of the Individual Defendants' abuse of control, LifeVantage has sustained significant damages.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, LifeVantage has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff on behalf of LifeVantage has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of LifeVantage in a manner consistent with the operations of a publicly-held corporation.

- 44 -

143.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, LifeVantage has sustained and will continue to sustain significant damages.

144.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

145.     Plaintiff, on behalf of LifeVantage, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

146.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused LifeVantage to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

148.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

149.     Plaintiff on behalf of LifeVantage has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of LifeVantage,

and that Plaintiff is an adequate representative of the Company;

      (b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to LifeVantage;

      (c)    Determining and awarding to LifeVantage the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

      (d)    Directing LifeVantage and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LifeVantage and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2.  a provision to permit the shareholders of LifeVantage to nominate at least four candidates for election to the board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)    Awarding LifeVantage restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 30, 2017

**HATCH, JAMES & DODGE, P.C.**
Mark F. James

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.

**THE BROWN LAW FIRM, P.C.**

/s/  *Mark F. James*

**By:** _____

Attorneys for Plaintiff

VERIFICATION

I, Rob Hansen, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 27th day of January, 2017.

_____
Rob Hansen